# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------X
**DENISE KEMP,**           Index No: 68499/2019

          **Plaintiff,**

                                                                         **COMPLAINT**

        -against-

**REGENERON PHARMACEUTICALS, INC.,**

                     **Defendant.**

-------------------------------------------------------------------X

Plaintiff Denise Kemp, by her attorneys Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, N.Y. 10006, and Bergstein and Ullrich, LLP, whose offices are located at 5 Paradies Lane, New Paltz, N.Y. 12561, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Denise Kemp, a loyal and dedicated longtime former Manager at Defendant Regeneron Pharmaceuticals, Inc., was unlawfully and discriminatorily demoted and constructively terminated from her employment because of the perceived and/or actual disability status of her daughter under the New York State Human Rights Law ("NYSHRL") and because Plaintiff provided care to her under the Family Medical Leave Act ("FMLA).

2. Defendants subjected Plaintiff to an offensive and hostile work environment and a series of discriminatory employment actions and offensive comments because Plaintiff's disabled daughter was hospitalized and Plaintiff, who regularly worked remotely, worked from the hospital while her daughter recovered.

1

3. In addition, instead of offering Plaintiff FMLA leave and/or NYSHRL accommodations, or engaging in an interactive dialogue with her, Defendant demanded to know what Plaintiff would do "the next time" her daughter was hospitalized, even while admitting that Plaintiff had well-performed her work from the hospital. Defendant made it clear that Plaintiff was forbidden from maintaining her managerial role if she intended to care for her daughter in the future. Plaintiff ultimately was demoted, and management intentionally created such an intolerable work environment that she had no choice but to resign her position.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter, and venue is proper in this district, because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in Westchester County.

## PARTIES

5. At all times relevant to this case, Denise Kemp was a resident and domiciliary of Albany County, New York. Plaintiff was an "employee" of Defendant as that term is defined by FMLA and the NYSHRL. At all times relevant to this case, Defendant employed more than 50 persons. Plaintiff worked at least 1,250 hours in the 12 months prior to her constructive discharge.

6. Defendant Regeneron Pharmaceuticals, Inc., is a pharmaceutical company with headquarters located at 777 Old Saw Mill River Road, Tarrytown, New York 10591, and a business address of 81 Columbia Turnpike, Rensselaer, New York 12144. Defendant was Plaintiff's "employer" as that term is defined by FMLA and the NYSHRL.

## FACTUAL ALLEGATIONS

### Plaintiff Has a Disabled Daughter

7. Plaintiff is the sole and primary guardian for her daughter, who suffers from

2

developmental disabilities and has the cognitive ability of an 8-year-old. She suffers from Ehlers Dandlers syndrome (EDS) involving hypermobility, which means that her body does not process collagen properly.

8. Because Plaintiff's daughter has a severe form of EDS that affects her entire body, her internal organs, vessels, and arteries are at risk of rupture. Emergency room visits, doctors' visits and hospital stays are a part of her daughter's life, and therefore a part of Plaintiff's life.

### Defendant's Work Environment

9. Plaintiff started working for Regeneron in 2009 as a Senior Auditor in Defendant's Quality Auditing (QA) Department. Plaintiff loved her job and her hard work and dedication was quickly rewarded time and again with a series of promotions, first to Auditing Administrator, then to Supervisor, then to Associate Manager, then to Manager, and then to Senior Manager of Auditing in QA.

10. Plaintiff understood -- and it was common knowledge in the workplace -- that employees in QA were only required to be in the office if there was a regulatory inspection. As these inspections happened infrequently, working remotely and calling in to meetings was acceptable with management, and employees routinely worked remotely.

11. Additionally, Defendant widely touted itself as a family-friendly atmosphere and employees were routinely told to take care of any personal or family issues as needed, so long as they completed their work.

12. As a Senior Manager, Plaintiff managed approximately 15 people who were constantly traveling for work. She was supported by one administrative person who generally worked at the office.

13. Of her team of approximately 16 staff, four employees managed the other 12

3

employees and directly reported to Plaintiff.

14. At all times during her employment, Plaintiff was often not in the office. She often worked from home and also travelled frequently, as required for work.

15. Plaintiff reported to Senior Director Teresa Rivenburg, with whom she initially enjoyed a healthy work relationship. Rivenburg was largely responsible for recognizing Plaintiff's hard work and talent, and she repeatedly promoted her.

### Plaintiff's Daughter Requires Major Surgery

16. In or about Fall 2015, Plaintiff's daughter suffered a serious complication from her disability and required a major periesophageal hernia surgery.

17. Plaintiff's daughter was hospitalized for approximately ten days. During that time period, Plaintiff worked remotely, with Rivenburg's full knowledge. Plaintiff performed as she always did, at an excellent level.

18. After Plaintiff's daughter was released from the Hospital, Plaintiff had a family member provide additional care during workdays. Plaintiff saw her daughter and her caregiver at follow up doctor's appointments before returning to work. When this happened, Plaintiff always completed all of her work professionally.

19. At work, Plaintiff was open about the health issues that her daughter was facing, and at no time did anyone in management say anything negative about her performance, or the fact that she had been working remotely. No one raised any work issue with Plaintiff during the time of her daughter's illness.

### Plaintiff is Frozen Out When Her Daughter is Hospitalized Again

20. Approximately three to four months after the first round of hospitalization, Plaintiff's daughter again began suffering significant health problems, and it was clear the surgery

4

had not been successful. After several visits to the Emergency Room, it was determined that Plaintiff's daughter would again require surgery.

21. Plaintiff's daughter was hospitalized for approximately ten days, and once again Plaintiff worked remotely during the hospitalization. Rivenburg had full knowledge of Plaintiff's work arrangement. Although she would have preferred to take time off of work – and she was entitled it – since Plaintiff did not want to let her team or Rivenburg down, she worked through the hospitalization.

22. As she had done during the first surgery, Plaintiff met all of her deadlines during the second surgery and nothing fell through the cracks. However, this time around, Plaintiff noticed that Rivenburg was not responding to her phone calls, text messages or emails, something that had never previously happened during Plaintiff's career with Defendant.

23. Plaintiff hoped that Rivenburg was simply trying to be supportive and not "bother" Plaintiff, because she knew that Rivenburg trusted her to complete her work, but the way Rivenburg had frozen her out entirely was highly unusual and caused Plaintiff much distress during an already difficult time.

**Rivenburg Retaliates Against Plaintiff Upon Her Return to the Office**

24. The next time that Plaintiff went to the office, Rivenburg refused to engage with her at all. Plaintiff repeatedly asked Rivenburg what the problem was, but Rivenburg would not answer her questions and routinely avoided her.

25. Finally, Plaintiff approached Rivenburg in her office and asked her to explain what the problem was.

26. Rivenburg blew up and said, "It's your daughter! It's always one thing after another with her. And you know it's going to happen again? And what are you going to do then. Huh?

5

Huh? Huh?"

27. Plaintiff was shocked by Rivenburg's level of anger and frustration. Plaintiff calmly asked if there had been a problem with her performance during either surgery. Rivenburg admitted there were no problems but that Plaintiff's caring for her daughter was unacceptable.

28. Rivenburg demanded to know what Plaintiff intended to do if her daughter again needed hospitalization. Plaintiff responded, "I am going to do what I have always done if it happens again -- take care of my daughter and do my job."

29. Rivenburg continued to angrily complain about Plaintiff's concern for her daughter.

30. Plaintiff interrupted and asked, "Are you firing me?" Rivenburg responded, "No, but you need to look for a position that is less demanding."

31. Plaintiff was shocked that she was losing her role -- and being demoted -- because she had a sick child. Plaintiff had never let her daughter's illness interfere with her commitment to her work. As a single mother, Plaintiff needed -- and could never take for granted -- the job that allowed her to care for her special-needs daughter.

32. Plaintiff was further shocked by a new "rule" that Rivenburg put in place for her and her alone: Plaintiff was only allowed to work outside of the office for one day a week, no matter what her daughter needed, even if her daughter was hospitalized or had two doctors' appointments in the same week.

**Plaintiff is Shamed and Humiliated by the Search for Her Replacement**

33. Shortly thereafter, Defendant started looking for Plaintiff's replacement. Rivenburg coolly advised Plaintiff, "we've posted your position." Sure enough, the post was listed both internally and externally. Multiple co-workers contacted Plaintiff to ask why she was being demoted. They also wanted to know what had happened that would cause Plaintiff to lose her job.

34. After the job was posted, Plaintiff asked Rivenburg, "Did anyone have a problem when I wasn't in the office?" Rivenburg responded, "No." Plaintiff asked, "Did anything fall through the cracks?" Rivenburg again responded, "No." Plaintiff asked, "Did I put an undue burden on anyone?" Rivenburg responded, "No."

35. Plaintiff told Rivenburg, "I don't understand what the problem is and why I have to lose my job." Rivenburg replied, "Because you know it's going to happen again, it's always one thing after the other with her," speculating that Plaintiff's daughter would of course require more surgeries. Rivenburg was assuming without any factual basis that Plaintiff's daughter's health condition would distract Plaintiff from her job responsibilities.

### Rivenburg's Boss Dismisses Plaintiff's Objections to the Discrimination

36. Shocked at the discrimination and retaliation, Plaintiff told Rivenburg's boss, Vice President of Quality Patrice Gilooly, that she was being punished for having a sick child.

37. Gilooly told Plaintiff that she *was* taking too much time off because of her daughter. Plaintiff responded, "I worked every day from the hospital, and [Rivenburg] knew that I was working from the hospital and told me that she got it and that 'it was ok.'"

38. Gilooly advised Plaintiff that she would be better suited for a "different position" because she was "out too much" for her daughter, and that she was not allowed to have direct reports because of her daughter's needs.

39. In fact, Plaintiff was not "out too much" because of her daughter's medical needs. Instead, as alleged above, Rivenburg told Plaintiff there were no problems with Plaintiff's performance but that Plaintiff's caring for her daughter was unacceptable. Gilooly was assuming without any factual basis that Plaintiff's daughter's health condition would distract Plaintiff from her job duties.

7

**Human Resources Sides with Rivenburg when Plaintiff Reports the Discrimination**

40. Plaintiff was shocked to be treated so badly by a company for which she had worked tirelessly. She reported to Theresa Thompson in Human Resources what was going on, stating that she was being unfairly punished for having a sick child.

41. In response, Human Resources repeatedly told Plaintiff that, "given her responsibilities," it was better that she "change roles" and that she should accept a demotion. Human Resources was punishing Plaintiff by assuming without any factual basis that her daughter's medical condition would distract her from her job responsibilities. In all of the years that Plaintiff had worked at Regeneron, every employee who had been demoted out of their role soon quit or was terminated because it was widely known at the company that a demotion meant that you were no longer welcome or wanted at the company.

42. Human Resources advised Plaintiff that she had two choices, either continue working with Rivenburg but relinquish all of her direct reports, or work for another Senior Director, Collin Hutchinson. Neither Human Resources nor anyone else was able to clarify for Plaintiff what her role would be if she stayed with Rivenburg without any direct reports, since her job involved managing 16 people, and Rivenburg and made it clear that Plaintiff was not welcome or wanted on her team.

43. Human Resources also ridiculed Plaintiff, comparing her to an employee who asked to only work at home so that he could care for his infant child. Plaintiff was appalled, pointing out that the situations could not have been more different, as Plaintiff's daughter at all times had full-time care, and Plaintiff never asked to provide care for her daughter on a regular basis. Rather, Plaintiff had simply worked from a hospital room on two occasions, and, as always, had performed her work professionally and exemplary.

8

### Plaintiff's Direct Reports Note That Rivenburg was Trying to Drum Up Complaints

44. Several of Plaintiff's direct reports advised her that Rivenburg asked them if they ever had issues getting ahold of Plaintiff for work-related matters and if they were getting what they needed from her. They advised Plaintiff that they told Rivenburg that they were getting everything they needed from Plaintiff and that they had no issues with her, even during the two occasions when she was working from the hospital.

### Plaintiff Learns She is Forbidden from Having Direct Reports Because She has a Disabled Daughter

45. Trying to salvage her career at with the company, Plaintiff met with Hutchinson, for whom Human Resources suggested she should consider working. To her horror and humiliation, Hutchinson told Plaintiff that he was unsure what she could do for him because Human Resources told him that Plaintiff was "not allowed to have any direct reports because of her daughter." Here again, Plaintiff was being punished for her association with her disabled daughter.

46. Thereafter, Plaintiff's raise and bonus were far lower than they should have been, no new assignments were given to her, and she was supposed to somehow create an assignment out of thin air but could no longer have any direct reports for the sole reason that she had a disabled daughter. Nor was Plaintiff allowed to work outside of the office more than one day a week though everyone else was allowed to do so. Humiliated and appalled, Plaintiff had no choice but to accept that she was no longer welcome or wanted at Defendant. As these working conditions had made her work environment intolerable, and she was being set up to fail, Plaintiff had no choice but to submit her resignation.

### AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination in Violation of the New York State Human Rights Law)

47. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

48. Defendants discriminated against Plaintiff in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, demoting her and constructively terminating her employment from the company because of the actual or perceived disability status of her family member and because of her status as a caregiver.

### AS AND FOR A SECOND CAUSE OF ACTION

### (Discrimination in Violation of the New York State Human Rights Law)

49. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

50. Defendant discriminated against Plaintiff by assuming without any factual basis that her daughter's disability would distract her from performing her job responsibilities. As such, Defendant discriminated against Plaintiff because of her protected association with her disabled daughter.

### AS AND FOR A THIRD CAUSE OF ACTION

### (Retaliation in Violation of the New York State Human Rights Law)

52. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

53. Defendants retaliated against Plaintiff for her engagement in protected activities, including, but not limited to, requesting and taking an accommodation to care for her child disability, and for opposing Defendants' discrimination against her because of the actual or

perceived disability-status of his family members and because of her status as a caregiver. Defendants' retaliatory conduct includes, but is not limited to, the unlawful termination of Plaintiff's employment.

54. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation and benefits for which Plaintiff is entitled to an award of damages.

55. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

### *(*Family and Medical Leave Act - Interference*)*

54. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

55. In making it clear that the company would not tolerate Plaintiff's continued time off to care for her disabled daughter, Defendant willfully interfered with Plaintiff's rights under the FMLA, under which she would be entitled to 12 weeks' unpaid leave to care for a disabled child.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York and FMLA;

B. An award of damages, including liquidated damages, compensatory damages, and/or punitive damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

C. An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

D. An award of damages to be determined at trial, to compensate Plaintiff for physical injuries, emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

E. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

F. Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
      February 14, 2020

                              GODDARD LAW, P.L.L.C.

                      By:  /s/ Megan Goddard_____
                              Megan S. Goddard, Esq.
                              39 Broadway, Suite 1540
                              New York, New York 10006

                              BERGSTEIN & ULLRICH, LLP
                              5 Paradies Lane
                              New Paltz, New York 12561
                              (845) 469-1277

                              *Attorneys for Plaintiff*