USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/11/2023 _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Denise Kemp,

                    Plaintiff,

          v.

Regeneron Pharmaceuticals,

                    Defendant.

20 CV 2270 (NSR)
OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge

Plaintiff Denise Kemp ("Plaintiff") brings this action against Defendant Regeneron Pharmaceuticals ("Defendant"), asserting claims for violations of the New York State Human Rights Law ("NYSHRL") and the Family Medical Leave Act ("FMLA"). Specifically, Plaintiff asserts three claims pursuant to the NYSHRL— discrimination, constructive discharge, and retaliation due to Plaintiff's daughter's disability. Plaintiff also alleges that Defendant interfered with her right under the FMLA to take twelve (12) weeks of unpaid leave to care for a disabled child.

Before the Court is Defendant's motion for summary judgment, which is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 30.) For the following reasons, Defendant's motion is GRANTED in its entirety.

## BACKGROUND

The facts are gleaned from the Complaint ("Compl.") (ECF No. 1-4), Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") (ECF No. 31), and Plaintiff's Counter Statement to Defendant's Rule 56.1 Statement ("Plf. Resp") (ECF No. 40) and are uncontested except where indicated.

1

### *Plaintiff's Hire and Promotions*

On June 2, 2008, Plaintiff Denise Kemp ("Plaintiff") began working for Defendant Regeneron ("Defendant") in its Quality Assurance Department. (Def. 56.1 ¶ 3.) Plaintiff performed well in her initial position as a Senior Good Manufacturing Practices ("GMP") Auditor and Defendant rewarded her with promotions, raises, and additional stock option grants. (*Id.* ¶¶ 3-11.) Specifically, Plaintiff was promoted to Associate Manger, Quality Auditing in 2012, to Manager, Quality Auditing in 2014, and to Senior Manager, Quality Auditing in 2016. (*Id.* ¶¶ 7-8.) Plaintiff's 2014 and 2016 promotions were based on the recommendations of Kemp's direct supervisor, Teresa Rivenburgh ("Rivenburgh"), the Senior Director of Quality Assurance Operations for Defendant. (*Id.*)

When Plaintiff left Defendant's employ in December 2016, her final annual salary was nearly double her starting salary (representing a rise of $73, 484 increase). (*Id.* ¶ 11.)  Additionally, as of January 2017 Plaintiff had received options to buy 12,6000 shares of Defendant's common stock, of which she exercised 10,375 shares, representing a more than $2,000,000 W-2 gain. (*Id.*)

### *Plaintiff's Relationship with Rivenburgh*

Plaintiff and Rivenburgh sat next to one another while both worked in the office, often discussed their personal lives and families, and Rivenburgh met Plaintiff's children on multiple occasions. (*Id.* ¶ 14.)  Rivenburgh was, accordingly, aware that one of Plaintiff's daughters suffers from a serious health condition. (*Id.* ¶ 15.)

Although Defendant alleges that Rivenburgh was happy to help Plaintiff care for her daughter, including accompanying Plaintiff's daughter to doctor appointments, Plaintiff claims that Rivenburgh was not accommodating of Plaintiff's requests to attend to her daughter's needs. (*Id.* ¶ 15; Plf. Resp. ¶ 14.)

*Plaintiff's Remote-Work and Potential Move to a New Role*

Defendant alleges that, beginning in early June of 2016, Plaintiff began to work from home frequently. (Def. 56.1 ¶ 19.)  Specifically, Defendant alleges Plaintiff applied for FMLA leave and short-term disability benefits in late March 2016 in connection with her April 2016 surgery and that Defendant granted these requests. (*Id.* ¶ 19.) Plaintiff thus took a fully paid leave from April 4, 2016 through May 15, 2016. (*Id.* ¶ 18.) Additionally, Defendant claims that Plaintiff worked from home fifteen (15) out of the twenty (20) workdays in June and describes the extent of her work from home as "excessive." (*Id.* ¶ 23.) Defendant notes that its managers (such as Plaintiff) were expected to be onsite and available in order to address needs that arose throughout the day and to attend meetings in-person., but that they permitted Plaintiff to work remotely at this time. (*Id.* ¶ 21.)

Although Plaintiff does not disagree with the content of Defendant's allegations regarding her remote work and leave, she seems to dispute their characterization. (Plf. Resp. ¶ 19.)  Plaintiff claims that she worked from the hospital for fifteen (15) days in June of 2016 to care for her daughter while her daughter was in the hospital. (*Id.* ¶ 6.1.) She further claims that she and her department had always operated remotely, and that working remotely was routine and acceptable for the auditing department generally. (*Id.*) However, Plaintiff admits that ten days in June of 2016 was an unusually large number of days to not report to the office in a month. (ECF No. 35-1, at 13.)

Following Plaintiff's numerous remote-work days in June 2016, during the first week in July 2016, Rivenburgh told Plaintiff that she needed to increase her visibility in the office and attend meetings in-person. (Def. 56.1 ¶ 27.)  Defendant claims that Rivenburgh and her supervisor, Patrice Gilooly ("Gilooly"), thereby created an accommodation for Plaintiff that would enable her

to work one day per week from home per week and require Plaintiff to use paid time off ("PTO") or intermittent FMLA leave for any other day. (*Id*. ¶ 28.) Although Plaintiff agrees this arrangement was implemented, she describes it as a "limitation" placed on her because Defendant believed she was working from home too frequently; she alleges that both auditors and supervisors regularly worked from home. (Plf. Resp. ¶ 25.1.) Nevertheless, Plaintiff applied for intermittent FMLA leave in connection with her daughter's health condition on July 13, 2016; Defendant approved this leave and it was scheduled from August 9, 2016 through February 8, 2017. (Def. Resp. ¶¶ 36-37.)  It is also undisputed that Plaintiff's daughter went to a day program daily, that Kemp had live-in help seven days per week, and, most significantly, that Defendant never denied a request from Plaintiff to leave early, work remotely, or take PTO, whether for medical appointments or other matters. (*Id.* ¶ 40.)

Defendant further alleges that, in July of 2016, Plaintiff approached Gilooly to express her desire to transition to a role with the same status and title as her current role, but which had less managerial responsibilities. (Def. Resp. ¶ 45.)  According to Defendant, Plaintiff sought a role that would: (1) enable her to have a better work/life balance; (2) not have any employees reporting directly to her; and (3) enable her to work with Cory Hutchinson ("Hutchinson"), who at the time was an Executive Director in the Quality Assurance Department. (*Id.* ¶ 46.) Defendant claims that, over the following months, Plaintiff worked directly with Hutchinson to create a new position of this type and even helped to write and edit the position's job description. (*Id.* ¶ 7.)  Conversely, Plaintiff alleges that she met with Gilooly to complain that Rivenburgh created the new remote working arrangement and suggested Plaintiff transition into the new role in order to punish Plaintiff for having a sick child. (Plf. Resp. ¶ 41.1.) Plaintiff further claims that although she had control over creating the responsibilities for the new position "to a certain degree," Gilooly and

Hutchinson expected Plaintiff to work in the office four days per week and would not allow her to manage direct reports. (*Id.* ¶ 41.1.) Moreover, Plaintiff characterized the new position as a "demotion" because she would not have supervisory responsibility. (*Id.* ¶ 71.1.) Defendant rejects this characterization, noting that there are senior and prominent employees at Defendant who do not supervise any coworkers. (Def. Resp. ¶ 75.)

### *Plaintiff's Departure From Defendant*

Despite Plaintiff's complaints, it is undisputed that she agreed to transition into the new role that she helped to create in early 2017 and that, in October of 2016, Defendant posted a job opening for the position Plaintiff intended to leave. (Def. Resp. ¶¶ 49, 53.) It is also undisputed that Plaintiff never actually left her position as a Senior Manager; she retired from Defendant in January of 2016 instead of transitioning into her new role. (*Id.* ¶ 55.) However, the parties dispute the reason for Plaintiff's departure. Whereas Defendant alleges that Plaintiff genuinely left to retire and told various coworkers that she planned to live off her stock holdings (*Id.* ¶¶ 56-64.), Plaintiff alleges that she only represented to her coworkers that she was leaving to retire because she did not want to burn bridges with Defendant. (ECF No. 35.1, at 7.)

As a final matter, Plaintiff alleges that Defendant reduced her bonus in 2016 in retaliation for her time spent caring for her daughter. (ECF No. 38, at 17.) Defendant, however, states that Plaintiff received substantially similar bonuses in 2015 and 2016 (i.e., $23,620 in 2016 and $22,964 in 2017), and that these bonuses were consistent with the bonuses that other high performing senior managers received in these years. (Def. Resp. ¶ 79.)

## **LEGAL STANDARD**

### I.   **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This Rule states, in pertinent part: "The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed.R.Civ.P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of

fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the records" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## DISCUSSION

### I.   Discrimination in Violation of New York State Human Rights Law

Even assuming, *arguendo*, that each of Plaintiff's discrimination claims pursuant to the NYSHRL are not time-barred, they fail on the merits. Plaintiff brings three separate claims for discrimination under the NYSHRL against Defendant. The first concerns her alleged constructive discharge, the second concerns Defendant's alleged discrimination against her based on her protected association with her disabled daughter, and the third concerns her retaliation against

Plaintiff for engaging in protected activities, such as taking an accommodation to care for her disabled child. (Compl. ¶¶ 47-55.)

**A. Legal Standard for NYSHRL Discrimination Claims**

Courts in this Circuit analyze the merits of NYSHRL employment discrimination claims, such as those at issue here, using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973*). See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010); *Bermudez v. City of New York*, 783 F.Supp.2d 560, 576 (S.D.N.Y. 2011). This test requires first that a plaintiff establish a *prima facie* case of discrimination by showing that: (i) she was part of a protected class; (ii) she was competent to perform the job in question or was performing his job duties satisfactorily; (iii) she suffered an adverse employment action; and (iv) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Spiegel*, 604 F.3d at 80; *accord Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).

The plaintiff's burden in establishing a prima facie case is "*de minimis.*" *Sassaman v. Gamache*, 566 F.3d 307, 311–12 (2d Cir. 2009). The burden then shifts to the defendant to provide a legitimate, non-discriminatory basis for its action. *Spiegel*, 604 F.3d at 80. If the defendant produces evidence of a legitimate basis for its employment decision, then the burden returns to the plaintiff to "come forward with evidence that the defendant's proffered, nondiscriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *accord Spiegel*, 604 F.3d at 80.

As discussed *infra*, the Court finds that Plaintiff has failed to establish a *prima facie* case of discrimination, given that she has failed to raise an issue of triable fact as to whether she suffered an adverse employment action with respect to any of her claims.

8

**B. Alleged Constructive Discharge and Discrimination Based on Plaintiff's Daughter's**

   **Protected Status**

First, regarding Defendant's alleged constructive discharge of Plaintiff and discrimination against her due to her association with her disabled daughter, an employer's action is materially adverse in such contexts where an employee experiences a "materially adverse" change in the terms of her employment in connection with her employer's discriminatory conduct. *E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 843 (S.D.N.Y. 2013); *see also Brown v. Am. Golf Corp.*, 99 Fed.Appx. 341, 343 (2d Cir. 2004) (summary order) (finding an employee's placement on an employment improvement plan insufficient to constitute an adverse employment action). *Id.* To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities; examples of such a change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

Here, Plaintiff's working conditions were not altered to the extent necessary to constitute a "materially adverse" change. Plaintiff remained in the position she occupied before the alleged discriminatory conduct occurred until her retirement on January 7, 2017, and she never received a decrease in her salary, less distinguished title, or an alteration of job responsibilities. (Def. Resp. ¶¶ 49-57.) Indeed, the only difference in her working conditions before and after Defendant altered them was the implementation of a rule that: (1) allowed Plaintiff to work from home one day per week without needing to take PTO or FMLA leave time; and (2) required that Plaintiff use PTO or FMLA leave time to work from home on any additional days she desired in each week. (*Id.* ¶¶ 25-28.)  *See Smalls v. Allstate Ins. Co.,* 396 F.Supp.2d 364, 370 (S.D.N.Y. 2005) (where an

employee retained the same position, salary and benefits, the Court found there was no adverse action)*; see also White v. Fuji Photo Film USA, Inc.*, 434 F.Supp.2d 144, 152 (S.D.N.Y. 2006) (noting, the "law does not support a claim that a title change, with no change in salary or benefits, is considered an adverse employment action"). It is undisputed, too, that Plaintiff never needed to use additional leave time to work from home more than one day per week and was never denied a request for leave or to work from home. (*Id.* ¶ 40.)

Plaintiff argues, though, that the role in Defendant's organization into which she was set to transition in January of 2017 represented a loss of prestige and responsibility. (Plf. Resp. ¶ 71.1.) But even if one sets aside the fact that Plaintiff never actually left her position, this new role did not represent a materially adverse change in her employment circumstances. Although Plaintiff would not have been permitted to have direct reports in her new role, unlike in the one she from which she was to leave, Plaintiff does not allege (and it is not apparent from any evidence provided to the Court) that she would have adopted a less prestigious title, performed less significant work, or accepted a decreased salary. *See Mishk v. Destefano*, 5 F.Supp.2d 194, 202 (S.D.N.Y. 1998) (where the Court found that a lateral transfer is not an adverse employment action). Additionally, another of Defendant's employees, Patricia Gilooly (who was Rivenburgh's supervisor), attested that there were highly prestigious roles in Defendant's organization that did not involve managing direct reports. (ECF No. 35-3, at 10.) Thus, since Plaintiff did not suffer a "materially adverse" change in circumstances, she has not shown that there is a genuine issue of fact as to whether she can establish a *prima facie* case for either constructive discharge or discrimination.

## C. Alleged Retaliation Claim for Engaging in Protected Activities

"An employer's action is materially adverse within the context of a retaliation claim where it is harmful to the point that it could well dissuade a reasonable worker from making or supporting

a charge of discrimination." *Atencio v. U.S. Postal Serv.*, 14-cv-7929 (GHW), 2015 WL 7308664, at *8 (S.D.N.Y. 2015) (internal quotations omitted). Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms." *Burlington Northern & Santa Fe Railway Co. v. White*, –—— U.S. ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Prototypical examples of adverse employment actions include termination, demotion via a reduced wage, salary, or job title, a material loss of benefits, or significantly reduced responsibilities. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (in which the Court found no adverse employment action where defendants forced plaintiff to switch to an office she viewed as less desirable); *cf. White*, 126 S.Ct. 2405 (where the Court found that plaintiff's reassignment from forklift duty to standard track laborer was materially adverse because, *inter alia*, the plaintiff's former position was considered more prestigious by virtue of requiring more skill, was significantly less physically arduous, and was objectively considered a better job by employees).

As noted *supra*, Plaintiff never experienced, and would not have experienced even had she moved to the new position created for her, a reduced wage, salary, job title or material loss of benefits. And although she would no longer have managed direct reports in this new position, Defendant and one of its senior employees both attest that there were prominent members of its company who did not directly supervise other employees. (Def. Resp. ¶ 75; ECF No. 35-3, at 10.) It is, then, unlikely that the rule Defendant implemented requiring Plaintiff to use PTO or FMLA leave time should she need to work from home more than one day per week, or the change to the new position that she helped to create for herself (and which she never actually undertook), would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (noting that the adverse action

"must be more disruptive than a mere inconvenience or an alteration of job responsibilities"). Thus, Plaintiff has not shown that there is a genuine issue of fact as to whether she can establish a *prima facie* case for her retaliation claim.

## II.     Family and Medical Leave Act – Interference

### A.  Standard and Statute of Limitations for an FMLA Interference Claim

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave in any twelve-month period, "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also provides that for eligible employees, "leave may be taken intermittently or on a reduced leave schedule when medically necessary." § 2612(b)(1).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." § 2615(a)(1). "A plaintiff may raise separate claims under the FMLA for 'interference' with rights and for 'retaliation'" against the exercise of those rights. *McFarlane v. Chao*, No. 04 Civ. 4871, 2007 WL 1017604, at *28–29 (S.D.N.Y. 2007) (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004)); *see also Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 175–76 (2d Cir. 2006).

To state a claim for interference with FMLA rights, a plaintiff must demonstrate that: (1) she is an eligible employee under the FMLA; (2) the defendant is an employer as defined by the FMLA; (3) the employee was entitled to take leave under the FMLA; (4) the employee gave notice to the defendant of his intention to take leave; and (5) the employee was denied benefits to which he was entitled under the FMLA. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

The statute of limitations for most FMLA claims is two years. *See* 29 U.S.C. § 2617(c)(1) ("[A]n action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."). However, a three-year statute of limitations exists for willful FMLA violations. *See id*. § 2617(c)(2) ("In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought."). An alleged FMLA violation is willful if an employer either knew or recklessly disregarded whether its conduct violated the FMLA. *See Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531–32 (2d Cir. 2004) (*per curiam*). However, if an employer acted reasonably, or even unreasonably but not recklessly, in determining whether its actions were illegal, the alleged violations should not be considered willful. *See id.* And, finally, the continuing violation doctrine, which provides that when a plaintiff experiences a continuous practice and policy of discrimination the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it, does not apply to claims brought under the FLSA, the Equal Pay Act, or FMLA. *Acosta v. Yale Club of N.Y., City*, No. 94 Civ. 888, 1995 WL 600873, at *3 (S.D.N.Y. 1995) (where the Court rejected the application of the "continuing violation" theory to FLSA claims because the FLSA does not permit challenges to violations occurring in pay periods outside the normal limitations period).

**B. Analysis**

Plaintiff advances the FMLA claim that "in making it clear that [Defendant] would not tolerate Plaintiff's continued time off to care for her disabled daughter, Defendant willfully interfered with Plaintiff's rights under the FMLA, under which she would be entitled to 12 weeks' unpaid leave to care for a disabled child." (Compl. ¶ 55.) Plaintiff alleges that her FMLA claim is

timely because disputed facts show that Defendant's actions were willful, which triggers the three-year statute of limitations for FMLA claims. Further, she alleges that the discrimination against her was a policy or practice that was consistently used against her from June 2016, when she worked remotely from the hospital where her daughter was being treated, through the end of her employment in December 2016, and that the continuing violation doctrine thereby applies to her FMLA claim. (ECF No. 38, at 4.) Defendant counters that Plaintiff cannot claim a willful violation, given that Defendant granted Plaintiff's requests for FMLA leave and did not discourage her use of the leave it granted. (ECF No. 32, at 15.)

Since it is undisputed that the date of the last event constituting the alleged violation occurred at the very latest in December 2016 and this action was brought on November 7, 2019, the Court would need to find that Defendant's alleged violation of the FMLA was willful. (ECF No. 1, at 1.) Here, Plaintiff has not shown that Defendant's conduct represented a willful violation of the FMLA. It is undisputed that Defendant never denied a request from Plaintiff to take leave under the FMLA, or to leave early, work remotely, or take PTO, whether for medical appointments or other matters. (Def. Resp. ¶¶ 49-57.)  As a result, Plaintiff has failed to raise a genuine issue of fact as to the fifth element of an interference claim – the denial of a benefit to which she was entitled. *See Amley v. Sumitomo Mitsui Banking Corp.*, No. 19CIV3777 CMBCM, 2021 WL 4429784, at *7 (S.D.N.Y. 2021) (noting that the plaintiff was not entitled to the three-year statute of limitations that applies for a willful violation of the FMLA because plaintiff failed to raise a genuine issue of fact as to either the fourth or fifth elements of an interference claim). The proper statute of limitations for Plaintiff's FMLA claim, then, is two years, as opposed to the three years permitted for a willful FMLA violation. Thus, Plaintiff's FMLA claim is time-barred.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in its

entirety. The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 30,

and to terminate the action.

SO ORDERED:

  Dated:    January 11, 2023
            White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

15